# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

11708 BIRCH AVE., UNIT A,
HAWTHORNE, CA 90250

Case No. 2:25-MJ-6598

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1028A, 1344, 1349, and 1708 | See affidavit and Attachment B |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_________days (*give exact ending date if more than 30 days*:_____________) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Elle Sarracco
*Applicant's signature*

Special Agent Elle Sarracco
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ____________________

*Judge's signature*

City and state: Los Angeles, CA

Honorable Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

# ATTACHMENT A

THE PREMISES TO BE SEARCHED IS:

11708 BIRCH AVE., UNIT A, HAWTHORNE, CA 90250 (REYNOLDS' APARTMENT). REYNOLDS' APARTMENT is an apartment within a small complex located on the east side of Birch Ave between W. 116th Street and W. 118th Street in Hawthorne. On the exterior of the building is the street number "11708", which runs horizontally. The complex is about two stories. The exterior of the building is beige or cream in color. REYNOLDS' APARTMENT is located on the first story, accessible via a pathway leading up to the door via a few steps. REYNOLDS' APARTMENT is facing a driveway and is the first unit visible from the street. There is a small porch attached to the unit, facing Birch Ave. The front door to REYNOLDS' APARTMENT is marked with the unit letter "A" to its left. The premises to be searched includes all of UNIT A.

# ATTACHMENT B

## I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1028A, 1344, 1349, and 1708 (aggravated identity theft, conspiracy to commit bank fraud, and possession of stolen mail, collectively the "SUBJECT OFFENSES"):

a. Documents and records containing coded language, such as "stats," "stimmy," "slips," "plugs," "clients," "piece," numbers without units (i.e., "piece for 400" or "stimmy like 50k business") or which refer to selling checks, sharing the proceeds from a check, selling anything for less than 25% of its value, checks which were unsuccessfully negotiated or deposited, or rejected bank transactions;

b. Personal identifying information of individuals other than those residing at 11708 BIRCH AVE., UNIT A, HAWTHORNE, CA 90250, including social security numbers, other identifying numbers, dates of birth, addresses and telephone numbers, credit, gift, or debit card information, PINs, credit reports, and bank or other financial institution information, and records referring or relating to such information;

c. Mail matter and shipping packages, opened or unopened not addressed to or from 11708 BIRCH AVE., UNIT A, HAWTHORNE, CA 90250, and documents or records referring or relating to the same;

d. Counterfeit identity documents, such as passports and driver's licenses, whether blank, completed, or partially

completed, and their components, such as seals, watermarks, security windows, official signatures, identification-proportioned photographs of faces, and programs or records referring or relating to them;

e. Currency, prepaid debit or credit cards, and casino chips with a value in excess of $1,000, including the first $1,000 if more than $1,000 is found;

f. Documents and keys relating to public storage units, rental cars, prepaid cellular telephones, safety deposit boxes, Commercial Mail Receiving Agencies, or receiving mail or deliveries at someone else’s address;

g. Records referring or relating to counter surveillance of law enforcement, jail or prison, arrests, criminal investigations, criminal charges, asset forfeiture, investigations by financial institutions, and the threatened or actual closure of accounts by financial institutions;

h. Documents and records referring or relating to currency transaction reports (CTRs), their reporting thresholds, attempting to structure cash transactions to avoid CTRs, cash transactions totaling over $10,000 even if conducted in lesser increments, or the purchase of more than $3,000 of postal money orders in a two-week period, or conducting multiple cash ATM transactions or purchasing multiple postal money orders on the same day;

i. Documents and records referring or relating to the conversion of cash to financial instruments such as checks and wire transfers, and vice versa, for a percentage of the

dollar value converted, or the transfer of cash abroad, such as through Hawalas or money transferring businesses, like Western Union, or the purchase of cryptocurrency for cash;

j. Records relating to wealth and the movement of wealth since 2023, such as tax returns and forms, crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders, brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $1,000;

k. Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched, such as keys, rental agreements, leases, utility bills, identity documents, cancelled mail, and surveillance video;

l. Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and Signal, ICQ, Telegram, and email addresses.

m. Cryptocurrency and related records and items, such as those referring or relating to public or private keys or

addresses, or cryptocurrency wallets or their parts, including "recovery seeds" or "root keys" which may be used to regenerate a wallet. Seizure of the cryptocurrency and wallets will be accomplished by transferring or copying them to a public cryptocurrency address controlled by the United States, or by restoring them onto computers controlled by the United States.

n. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

2. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

3. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

5. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed one year from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one-year period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team will not search for similar evidence outside the scope of the items to be seized without first obtaining authority to do so.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

f. If the search determines that a digital device is (1)itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device

a. During the execution of this search warrant, law enforcement is permitted to: (1) depress JAMELL REYNOLDS' thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific

finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of JAMELL REYNOLDS' face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant, and do not apply to any other search of digital devices.

**AFFIDAVIT**

I, Elle Sarracco, being duly sworn, declare and state as follows:

**INTRODUCTION**

1. I am a Special Agent employed with the U.S. Postal Service Office of Inspector General ("USPS OIG"), in the Los Angeles territory, since 2023. Prior to becoming a Special Agent with the USPS OIG, I was also employed part-time with the USPS OIG in Brooklyn, NY, where I worked alongside and gained experience from various Special Agents with a combined over twenty years of experience working in the field. Prior to becoming a Special Agent, I also obtained a Master of Arts Degree in Criminal Justice at John Jay College of Criminal Justice. I also obtained an Advanced Certificate in Criminal Investigations, where I successfully completed and earned the highest award of honors while completing various courses of instruction in investigations.

2. I have completed a 12-week Criminal Investigator Training Program at the Federal Law Enforcement Training Center, which included instructions in various courses pertaining to criminal investigations. I am currently assigned as a Special Agent with the Los Angeles Mail Theft team. As a Special Agent assigned to that team, I am responsible for the investigation of stolen U.S. Mail by a Postal Service employee, and further the unlawful use of stolen mail, which may include check fraud, credit card fraud, bank fraud, and identity theft.

## I. PURPOSE OF AFFIVAVIT: SEARCH WARRANTS

3. This affidavit is made in support of search warrants for the person JAMELL LEVANTE REYNOLDS ("REYNOLDS"), his residence, and his vehicle (collectively referred to as the SUBJECT PREMISES) for evidence of violations of 18 U.S.C. §§ 1028A, 1344, 1349, and 1708 (aggravated identity theft, conspiracy to commit bank fraud, and possession of stolen mail, collectively referred to as the "SUBJECT OFFENSES"), as described in attachment B which is incorporated by reference. The SUBJECT PREMISES are described in more detail in attachments A, which are also incorporated by reference:

a. The person JAMELL LEVANTE REYNOLDS;

b. 11708 BIRCH AVE. UNIT A, HAWTHORNE, CA 90250 (REYNOLDS' APARTMENT); and

c. A 2023 Nissan Pathfinder with California license plate number 9FTB752 and vehicle identification number ("VIN") 5N1DR3BD4PC206452, registered to JAMELL L REYNOLDS ("REYNOLDS' VEHICLE").

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of our investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only, and all dates and times are on or about those indicated.

## II. SUMMARY OF PROBABLE CAUSE

5. The U.S. Postal Service Office of Inspector General has been investigating mail theft by Postal Service employees in Torrance, California ("CA"). As part of this investigation, the USPS OIG identified an individual by the name of Mary Ann Magdamit, who was previously investigated for the theft of credit and debit cards, and checks from the mail, while she was employed as a letter carrier at the Torrance Main Post Office in Torrance, CA. The investigation revealed that during her employment with the Postal Service, Magdamit would steal credit, debit cards, and checks from the mail and sell them to multiple co-conspirators. She would also use the funds from the cards she stole for herself.

6. On December 2, 2024, the Honorable Stephanie Christensen signed a search warrant (Case No. 2:24-MJ-07148) for the residence, vehicle, and person of Mary Ann Magdamit. On December 4, 2024, search warrants were executed on Magdamit's residence, vehicle, and person for evidence of mail theft, bank fraud, and identity theft. Following the search warrants, in December 2024, Magdamit resigned from her position with the Postal Service. However, beginning in 2025, the USPS OIG continued to receive reports of mail theft in Torrance, CA specifically involving credit and debit cards. Further, Magdamit was identified through multiple sources, one to include surveillance video footage, as still using stolen credit cards

that should have been delivered to addresses in Torrance, CA. While Magdamit no longer worked for the Postal Service during this time, it was revealed she was still obtaining cards from a source with access to the mail in Torrance.

7. On June 26, 2025, the Honorable Pedro V. Castillo signed a criminal complaint (Case No: 2:25-MJ-03923-DUTY) for Magdamit’s arrest, and a search warrant (Case No. 2:25-MJ-03924-DUTY) for the residence of Magdamit. On July 1, 2025, Magdamit was arrested pursuant to the criminal complaint, and a second search warrant was executed on her residence, which elicited the discovery of several bank-issued cards in the names of individuals other than Magdamit. Follow up with some of the financial institutions responsible for issuing some of the cards discovered in Magdamit’s apartment revealed they were destined to victims residing at addresses in Torrance, CA. The search warrant in July 2025 also allowed for the search and seizure of Magdamit’s digital devices.

8. In August 2025, I began to review one of Magdamit’s cell phones, which revealed many messages between her and co-conspirators where she told them she was using a mail man (later identified as Jamell Reynolds) at the post office who provided her with stolen cards and checks. I discovered photographs of multiple stacks of mail in Magdamit’s cell phone that she would send to co-conspirators to solicit sales. The delivery addresses I could see for this stolen mail was always in Torrance, and the mail post-dated Magdamit’s resignation from the post office, suggesting that she did in fact have an insider

at the post office, as she bragged to her clients, and that it was someone who worked at the same Torrance office that Magdamit formerly did.

9. Also in this phone, I discovered that Magdamit was using the platform Telegram, an encrypted cloud-based, cross-platform social media and instant messaging service, to converse with a Telegram user with the handle "J The Man Man". I reviewed messages from June 2025 between Magdamit and "J The Man Man" and discovered conversations discussing meeting spots, where the Telegram user mentioned having cards to give Magdamit. I also discovered a phone number in Magdamit's cell phone under a very similar contact name, "J The Man The Man". The phone number in Magdamit's phone under the name "J The Man The Man" is associated to Postal Service employment records for an individual by the name of JAMELL REYNOLDS ("REYNOLDS"), a mail clerk employed at the Torrance Main Post Office.

## III. STATEMENT OF PROBABLE CAUSE

### Magdamit Was Working With a Postal Service Employee in Torrance

10. In August 2025, I began to review the contents of one of Magdamit's cell phones obtained from a search warrant executed on her residence on July 1, 2025. In this cell phone, I discovered many messages between Magdamit and co-conspirators revealing photographs of checks and cards in individuals' names other than Magdamit. The messages took place after Magdamit resigned from the post office and would therefore no longer have constant access to the mail.

11. In a Telegram message thread between Magdamit and a co-conspirator with a Telegram handle 585752983, I discovered the following conversations:

- On December 21, 2024, Magdamit sent Telegram User 585752983 several photographs of bank-issued cards in multiple individuals names other than herself. Some of the cards still had the financial documents attached to them, which of those I could see the addresses for, were destined to addresses in Torrance, CA.
- Continued on January 7, 2025, Magdamit sent Telegram User 585752983 a photograph of several U.S. Department of Treasury checks. Two of the checks I was able to see have addresses on them in Torrance, CA and are addressed to individuals other than Magdamit.

12. The photographs Magdamit sent to the co-conspirator revealed she was able to obtain stolen mail destined to Torrance, CA. In another conversation between Magdamit and Telegram User 585752983 I discovered the following messages:

- On February 6, 2025, User 585752983 to Magdamit: "you back to work"
- On February 6, 2025, Magdamit to User 585752983: "no still staying home I have a plug that works there" … "I have people that gives me cards"
- Continued on February 22, 2025, User 585752983 asks Magdamit again: "are u back to work"

- On February 22, 2025, Magdamit to User 585752983: "No I haven't been working for 2 months" … "I have a mail man working for me" … "I have a few"

13. In the messages Magdamit admits she was not stealing cards and checks herself as she was no longer working for the Postal Service and instead has a "mail man" working for her.

14. In Magdamit's cell phone, I also discovered a plethora of photographs that Magdamit sent to another co-conspirator on Telegram, with a Telegram handle of "Chase A Bagg", soliciting the sale of the items. The photographs contain mail pieces, financial documents, and bank-issued cards in many different individuals' names. Of the photographs I reviewed, the mail pieces and financial documents attached to the bank-issued cards all have addresses in Torrance, CA. I queried a sample of the addresses through Postal Service database records, which revealed the mail pieces should have been delivered by the Torrance Main Post Office.

**Magdamit Arranges Meetings to Purchase Stolen Cards**

15. In addition to the discovery of messages in Magdamit's cell phone where she admits she was using a mail man to obtain stolen cards and checks from, I also discovered Telegram messages in Magdamit's phone between Magdamit and a Telegram user with the handle "J the Man Man" that took place in June 2025, revealing conversations discussing cards and meet-ups. The following are examples of messages I discovered in this message thread:

- On June 25, 2025, Magdamit to "J The Man Man": "Lmk what

time you off gang" … "I can meet you tomorrow if you want I got bread for you." In my training and experience, "bread" is a common reference to money, suggesting Magdamit was going to pay the individual for something.

- On June 25, 2025, "J The Man Man" to Magdamit: "Bet" … Then on June 26, 2025, "J The Man Man" says "Meet in Inglewood in an hour…" … "Closer to rally's morning the open like usual.."
- Continued later in the conversation, "J The Man Man" says to Magdamit: "Gotta go somewhere that makes sense .."
- Following Magdamit says: "I'm here" … "But first row away from the cams" … "By two white van"
- On June 26, 2025, "J The Man Man" to Magdamit: "Pulling up.. at the light.."
- The messages then continue the following day on June 27, 2025, when "J The Man Man" asks Magdamit, "Anything hit?" I got more cards too.."
- Continued on June 27, 2025, Magdamit to "J The Man Man": "I haven't started yet I'm doing other plug shits today and buying all ssn for all the things I got from you I gotta buy them so gambling rn."

16. In my training and experience when "J The Man Man" asks Magdamit if anything hit, he is referring to whether any of the cards (that he mentions he has more of for her), were able to be successfully activated or able to be used. Magdamit responds to the message saying she is buying "all ssn for all the things" she got from him. The investigation into Magdamit

revealed she was purchasing social security numbers ("ssn") to activate stolen bank-issued cards from the mail, further alluding to the fact "J The Man Man" sold her cards during their meet-up.

17. In another conversation between Magdamit and Telegram handle "J The Man Man", I discovered the following messages which took place on June 28, 2025:

- Magdamit to "J The Man Man": "I'm about to buy this Edd social" … "Good batch gang"
- "J The Man Man" to Magdamit: "Bet.. hopefully heavy hitters.." This message was sent to Magdamit on June 28, 2025, at 11:38 PM (UTC).

18. The messages reveal "J The Man Man" sold Magdamit an Employment Development Department ("EDD") card, as Magdamit tells him she is going to buy a social (social security number) for the "Edd" and that he gave her a "good batch".

19. Separately, I discovered another message thread on Magdamit's cell phone with a Telegram handle "J". The messages in this thread from Magdamit did not download to the data extraction, and I was only able to review the messages sent from "J" in the conversation, but not from Magdamit. However, I believe "J" is the same Telegram user as "J The Man Man", based on the content of his messages. In this thread I discovered "J" sent the same message, "Bet.. hopefully heavy hitters.." on June 28, 2025, at 11:38 PM (UTC), as the one "J The Man Man" sent to Magdamit at the same time and on the same date, suggesting "J" is the same Telegram user as "J The Man Man". I also discovered

the same messages from “J” as the one’s between “J The Man Man” and Magdamit, discussing the meet up at “rally’s”, where he appears to sell her cards and says “Anything hit? I got more cards too..”, further suggesting Telegram user “J” is the same individual as Telegram user “J The Man Man”. Importantly, I reviewed the following message sent from “J” in this message thread:

- On June 14, 2025, “J” sent a message saying, “I can’t call that on my phone. That’s me getting in too deep.. I thought I sent this yesterday.. Can’t have nothing coming back to me or my phone cause it’s in my mom’s name..”

20. I know from my investigation into Magdamit that she was using her personal phone number to call into credit cards she stole from the mail to activate them or check the balances. “J” tells Magdamit he can’t call “that” on their phone, most likely referring to a credit card. He then tells Magdamit his phone is in his mom’s name.

**“J The Man Man” and “J” on Telegram are JAMELL REYNOLDS, a Mail Clerk for the Torrance Main Post Office**

21. I discovered a contact in Magdamit’s cell phone under the name “J The Man The Man”, which is very similar to the Telegram handle “J The Man Man”, whom Magdamit was conversing with to meet up to obtain cards. The phone number associated to the contact is (323) 459-0114. The phone number is listed in Postal Service records as the phone number for a mail clerk, Jamell REYNOLDS, who is assigned to the Torrance Main Post Office. Further, I discovered a few text messages between

Magdamit and phone number (323) 459-0114 (REYNOLDS PHONE), which took place between April and June 2025, in which most of the content of the messages have been deleted. In the messages however, I can see Magdamit say to phone number (323) 459-0114 (REYNOLDS PHONE), the word "Telly" over and over again, which I believe is a reference to Telegram, the encrypted platform Magdamit was using to converse with "J The Man Man", holding almost the same username as the contact in her phone under REYNOLDS' phone number.

22. In the Telegram messages between Magdamit and "J The Man Man", I reviewed a conversation where the two discuss meeting up after "J The Man Man" clocks out of work, which took place on June 28, 2025:

- Magdamit to "J The Man Man": "You wanna hold on to those or get it out your hands ?"
- "J The Man Man": "Gettem outta my hands fasho.. I'll meet you over there.."
- Magdamit to "J The Man Man": "Ok bet"
- "J The Man Man" to Magdamit: "Clocked out now…"

23. The message from "J The Man Man" saying "clocked out now", is most likely referring to clocking out of work, and took place on June 28, 2025. The message was sent at 6:08 PM in Coordinated Universal Time (UTC), according to the data extraction from Magdamit's cell phone. I used an open-source UTC time converter to Pacific Day Time ("PDT")/ Pacific Standard Time ("PST"), which revealed 6:00 PM UTC on June 28, 2025, is 11:00 AM PDT/PST on June 28, 2025. I queried Postal Service

database records for REYNOLDS attendance at work, which revealed on June 28, 2025, he clocked out of work at 11:07 AM PDT, one minute before the message was sent from "J The Man Man" to Magdamit telling her he clocked out of work.

**REYNOLDS Communicates with Magdamit Using a Phone in his Mom's Name**

24. In September 2025, I received records from AT&T containing the subscriber and toll records for phone number (323) 459-0114 (REYNOLDS PHONE). The records revealed the financial liable party and billing party of phone number (323) 459-0114, associated to REYNOLDS, is Constance Mc Nair, with an associated address of 8635 Somerset Blvd. Apt 209, Paramount, CA 90723. REYNOLDS Postal Service employment records reveal his emergency contact is "Constance Mcnair Tutt" who is listed as his "Mother". As previously described Telegram handle "J" on June 14, 2025, tells Magdamit, "can't have nothing coming back to me or my phone cause it's in my mom's name..", and phone number (323) 459-0114 is in REYNOLDS' mother's name.

**REYNOLDS' Location Matches that of a Meeting Between Magdamit and "J The Man Man" to Deliver Stolen Cards**

25. In the same Telegram message thread between Magdamit and "J The Man Man", where Magdamit tells "J The Man Man": "I'm about to buy this Edd social" … "Good batch gang", it appears they met to complete a sale near Magdamit's apartment. The messages took place on June 28, 2025. I reviewed the following conversation where the two discuss meeting up:

- Magdamit to "J The Man Man": "I'm at the crib now" …

"You can park across Carl's Jr or under ground" … "or park on Avalon by the pool" … "Fast transaction". These messages were sent between 6:45 PM and 6:46 PM (UTC). In my training and experience, "crib" is often a reference to someone's home.

- "J The Man Man" to Magdamit: "On Avalon..". This message was sent at 6:47 PM (UTC).
- Magdamit to "J The Man Man": "Yup just park on the street" … "Put your hazard on I'm coming down" … "You here?"
- "J The Man Man" to Magdamit: "I'm passing main, on Carson..". This message was sent at 6:48 PM (UTC).
- Continued in the conversation, Magdamit said to "J The Man Man": "Park right here on Avalon" … "Ima come out this gates"
- "J The Man Man" to Magdamit: "Fasho, bussing a b**** at 213th". This message was sent at 6:52 PM (UTC).
- At 6:54 PM (UTC), "J The Man Man" asks Magdamit: "You next to the union sign?"

26. The next message in the thread takes place on the same date at 7:07 PM (UTC) and is a message from Magdamit telling "J The Man Man" she's going to buy the "EDD social" and that he gave her a "good batch gang", suggesting a sale of credit/debit cards took place. Magdamit's apartment, where she was residing at this time, was at 21601 S Avalon Blvd., Carson, CA 90745, on the corner of Avalon Blvd. and Carson St.

27. Further, on September 29, 2025, the Honorable Charles

F. Eick signed a warrant (Case No. 2:25-MJ-5996) for GPS location data for REYNOLDS' phone, (323) 459-0114. I then received Timing Advance Location Information for REYNOLDS' phone from December 4, 2024, through September 30, 2025, which was also provided in UTC time zone. A review of this data revealed on June 28, 2025, between approximately 18:45 (or 6:45 PM) and 18:56 (or 6:56 PM), the timeframe a sale was completed between Magdamit and "J The Man Man" as shown in the Telegram messages, REYNOLDS' phone was in the vicinity of Avalon Blvd and Carson St., the same location as described in the messages at this time.

**REYNOLDS' iCloud Account Contains Photographs of Stolen Checks**

28. On September 19, 2025, the Honorable Karen L. Stevenson signed a search warrant (Case No. 2:25-mj-5823) for REYNOLDS' iCloud account. On September 29, 2025, I received records from Apple for REYNOLDS' iCloud account, with an associated Apple ID of reynoldsjamell@yahoo.com. In my review of REYNOLDS' iCloud account, I discovered several photographs, which appear to be photographs of checks destined to individuals or businesses other than REYNOLDS, with addresses in Torrance, CA.

29. For example, I discovered a photograph of a check over $390,000 dated October 20, 2023, and made payable to what appears to be a business, T. D. D. O. S., and destined to Torrance, CA 90501. The sender of the check also appears to be a business located in Bethpage, NY. Both the sender of the check and recipient of the check are not REYNOLDS. This is consistent

with photographs of checks I have discovered in the cell phones of individuals in other investigations, who have stolen and sold checks from the mail. In previous investigations I have worked, Postal Service employees who stole checks from the mail would photograph their stolen checks to send them to co-conspirators who they would then sell them to.

**REYNOLDS Uses Telegram to Discusses His Scheme**

30. I discovered multiple photographs in REYNOLDS' iCloud that appear to be screenshots taken from Telegram. The screenshots reveal content of messages that took place with a user with the handle "Yooooo". In one screenshot I reviewed the following message thread:

- The sender sent a photograph of what appears to be a mail piece, however, the majority of the photograph is cut off in the screenshot.
- User "Yooooo" replied: "Yessssirrrr" … "N**** I was knocked" … "225 added to the 715 I owe you is 940"
- The sender replied: "Another band!! We running it up!!! We gotta link quick when I get off cause I gotta get on the road.. ima call you when I'm leaving here.."
- User "Yooooo" replied: "Fasho around what time?"
- The sender replied: "I'm outta here in the next 20.." … "Just clocked out.. leaving now.." … "Wya?"
- User "Yooooo" replied: "Otw to the Stu" … "You?"
- The sender replied: "Leaving Torrance, tryna see where we can link , in the middle.."

31. Based on the content of the messages discussing "clocking out" and leaving "Torrance", where REYNOLDS works at the post office, and the fact that the screenshot was found in REYNOLDS' iCloud account, the "sender" in the messages is most likely REYNOLDS. The properties of the photograph reveal it was created on January 7, 2023. Similarly, in another screenshot appearing to have been taken from Telegram, I reviewed the following messages:

- User "Yooooo": "Just got up finna call up the ones from yesterday" … "These all the ones from today or are there more? Cuz the ssn N**** working still I'll send em all in". When the user says "calling up the ones from yesterday" they are most likely referring to activating stolen cards by telephone. The reference to having someone who does "ssn", corroborates this interpretation because social security numbers are typically needed to activate debit cards like EDD.
- The sender replied: "Those the ones for today.."
- User "Yooooo" replied: "Yeasssirrrrr" … "Finna send em in" … "Any other cards?"
- The sender replied: "That was it for the day, got a 3 band treasury check..." … "And like a 60 dollar one.."
- User "Yooooo" replied: "Ight fasho" … "700x2 500x2 350 250x2 200x2 1 not found and 1 wrong ssn putting those to the side".
- The "properties" of the photograph reveal it was created on January 18, 2023. REYNOLDS told User

"Yooooo" that he had a $3,000 and $60 Treasury check for them. User "Yooooo" also appears to add up numbers to a total, which seems to be money owed from sales.

**<u>REYNOLDS Stopped Using His iCloud Account to Store Fraud Photos After 2023</u>**

- REYNOLDS' iCloud account is associated with the same telephone phone number he provided to the Postal Service in his employment records: (323) 459-0114. The evidence of fraud that I found in his iCloud account was mostly from 2023. It therefore appears that he became more cautious—or less reckless—in 2024 as he seems to have stopped using the phone he disclosed to the Postal Service to photograph mail he was stealing around that time. In my training and experience, criminals often try to conceal their crimes and perfect their technique as time goes on. It is common for criminals to keep multiple cellular telephones. One might be a "public" telephone used for employment and legitimate daily activities. Others might be so-called "burner" phones that are not held in the criminal's name, and are used for criminal purposes so as to distance the evidence stored on them from the criminal. As described above, REYNOLDS continued to steal from the mail for Magdamit through her arrest in 2025, so it appears that he became cagier about storing photographs of stolen mail on the phone he disclosed to the Postal Service around the end of

2023.

**REYNOLDS lives at REYNOLDS' APARTMENT and Drives REYNOLDS' VEHICLE**

- I reviewed records from one of the three credit bureaus, Experian, which contained REYNOLDS' credit profile report. The review revealed the address 11708 BIRCH AVE APT A, HAWTHORNE, CA 90250 is listed as REYNOLDS' address on the profile.
- On September 30, 2025, I began to receive GPS/cell-site information for REYNOLDS' PHONE, phone number (323) 459-0114, which was obtained with a warrant. The location data for REYNOLDS' PHONE has often shown over multiple days that REYNOLDS' PHONE is within 0.3 miles or approximately 482 meters from REYNOLDS' APARTMENT, which is listed on REYNOLDS' credit report. This is within the margin for error of the location information for REYNOLDS' PHONE, and would be consistent with REYNOLDS residing at REYNOLDS' APARTMENT.
- Records from the California Department of Motor Vehicles ("DMV") confirm there is a 2023 Nissan with California License Plate 9FTB752 and VIN 5N1DR3BD4PC206452 registered to REYNOLDS.
- On October 9, 2025, while conducting surveillance at the post office, law enforcement observed a dark green Nissan with California plate number 9FTB752 (REYNOLDS' VEHICLE) parked in one of the employee lots of the

post office, while REYNOLDS was clocked into work and while REYNOLDS' PHONE location was in the vicinity of the post office.

**TRAINING AND EXPERIENCE REGARDING BANK FRAUD, MAIL THEFT, and CONSPIRACY**

- In addition to the foregoing facts, I have learned during my tenure as a Special Agent with the USPS OIG and from my conversations with other law enforcement agents who investigate fraud and mail theft that:

a. Individuals involved in fraud schemes, such as bank fraud, often use computers, cellular telephones, and mobile "smart phones" to conduct their fraudulent transactions. For example, such individuals often use computers, cellular telephones, and mobile smart phones to conduct online banking, the records of which may be stored on digital devices rather than paper records.

b. Persons who carry out fraud schemes typically use computers, cellular telephones, and mobile smart phones to communicate with their co-conspirators.

c. Individuals who engage in fraud schemes often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other digital devices for years after the fraudulent scheme has been completed.

d. People who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail

looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

e. It is a common for persons involved in mail theft to obtain counterfeit identity documents for themselves or others to aid in the negotiation of stolen checks or the use of stolen credit cards. More sophisticated mail thieves or their conspirators often counterfeit checks using a scan of a stolen check as the template. Commonly such criminals maintain the equipment to make such counterfeit checks in their residences. They also often have images of the stolen or counterfeited checks on their digital devices, which they typically keep on their persons, in their cars, and in their residences, as they do their counterfeit identity documents and records of the same.

f. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online

for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

g. Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

h. It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

i. Criminals who buy and sell contraband, such as stolen checks and debit cards, often pay one another for the contraband through peer-to-peer electronic payment systems like Zelle and Venmo. More sophisticated criminals often prefer to pay one another through cryptocurrency to render the transactions harder for law enforcement to trace.

**TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

- Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

- The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user’s fingers on a device’s fingerprint scanner for approximately one second. To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the JAMELL REYNOLDS' thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of the JAMELL REYNOLDS' face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

33. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IV. <u>CONCLUSION</u>

34. Based upon the foregoing facts and my training and experience, there is probable cause to believe that evidence, instrumentalities, and proceeds of the SUBJECT OFFENSES, as

described in Attachment, B will be found in the SUBJECT PREMISES.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this ____ day of October, 2025.

___________________________________
UNITED STATES MAGISTRATE JUDGE